## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NUNO CASANOVA,**

    **Plaintiff,**

    **v.**

**MARATHON CORPORATION,** *et al.,*

    **Defendants.**

**Civil Action No. 05-496 (JMF)**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was referred to me, upon consent of the parties, for all purposes including trial. Currently pending and ready for resolution is Chesapeake[1] Electrical System's Motion to Enforce Settlement [#233] ("Mot."). For the reasons discussed below, the motion will be granted.

## FINDINGS OF FACT

1.    This is an action in which the plaintiff, Nuno Casanvoa, is attempting to recover damages for an injury that he suffered while working on a construction site.

2.    Over the complicated history of this litigation, there have been several cross and counterclaims among the defendants.[2] For present purposes, the most significant is the crossclaim by Marathon Corporation ("Marathon") against Chesapeake Electrical System.

3.    On April 29, 2005, Marathon filed its answer to Casanova's complaint and its

---

[1] Hereafter "Chesapeake."

[2] See generally Casanova v. Marathon Corp., 570 F. Supp. 2d 53 (D.D.C. 2008).

crossclaim against Chesapeake.  Chesapeake, however, did not file its answer to that crossclaim until May 29, 2007, two years later.

4.      On August 15, 2007, this court granted Marathon's motion to strike Chesapeake's answer to Marathon's crossclaim "on the grounds that Chesapeake violated Rule 6(b) of the Federal Rules of Civil Procedure by failing to accompany the late-filed answer with a motion for leave to file it that established excusable neglect as required by that rule." Casanova v. Marathon Corp., 499 F. Supp. 2d 32 (D.D.C. 2007).

5.      Chesapeake then sought reconsideration of that decision but I denied its motion on December 10, 2007. Casanova v. Marathon Corp., 246 F.R.D. 376 (D.D.C. 2007). Thus, Chesapeake has been precluded from defending itself against Marathon's crossclaim that Chesapeake's negligence entitles Marathon to recover from Chesapeake Marathon's costs in defending itself against Casanova's claims.

6.      As of December 10, 2007, there have, therefore, existed at least[3] the following claims: 1) Casanova's claims against Chesapeake and Marathon for his injuries, and 2) Marathon's claims against Chesapeake for its costs in defending itself against Casanova's claims.  While the former was, at that point, headed for trial, because of this court's August and December, 2007 decisions, the latter claim was deemed conceded.

---

[3] There were other defendants known as the "dump truck" defendants, but by the time the parties were engaged in the negotiations that are the subject of this opinion, only Marathon and Chesapeake remained as defendants.  See Casanova v. Marathon Corp., No. 05-CV-496, 2008 WL 4356950 (D.D.C. Sept. 24, 2008).

7.     Charles Krikawa ("Krikawa") is the attorney for Casanova.  In April, 2008 the parties engaged in mediation before retired Judge Fitzpatrick.  Those efforts failed.  The offer made to plaintiff, $435,000, was unacceptable to plaintiff because he was unable to work out the lien asserted by his workmen's compensation insurance carrier.

8.     There were additional settlement negotiations in December, 2008 after a pre-trial conference.  The theme of these discussions was the same as previous attempts at settlement:  the only two remaining defendants, Marathon and Chesapeake, wanted to settle what Krikawa called "the entire case," meaning all claims Casanova had against Marathon and Chesapeake.

9.     In 2008, during these discussions, Krikawa spoke to Warren Stephens ("Stephens"), attorney for Chesapeake, and Joseph Cunningham ("Cunningham"), attorney for Marathon.

10.    Krikawa made it clear that his client would take $540,000 to settle the case and communicated that offer in separate phone calls to Stephens and Cunningham.  Cunningham, representing Marathon, indicated that he did not think defendants could meet that demand.

11.    On September 14, 2009, a status conference was held.  Immediately following the status conference, as counsel were leaving the courtroom, the parties again discussed the possibility of settlement. Mot. at 3.

12.    During that discussion, Stephens recollects that Cunningham said that he (Stephens) could settle the case if he could get $150,000 from Marathon.

3

Stephens recollects that Cunningham said: "What about our claim for fees and expenses?" Stephens recollects that he told Cunningham that "this is a global settlement–we won't settle unless it includes Marathon's claims against Chesapeake." Stephens then recollects Cunningham saying that his client, Marathon, would not go for that. Stephens told Cunningham to give him $150,000 for the settlement and to talk to his client.

13. Cunningham's recollection of what occurred is different. He specifically recalls ("it sticks in my mind") that as they left the courtroom, Stephens was imploring him to come up with a specific amount, $150,000. Cunningham recalls Stephens being almost dictatorial, premised on the belief that the defendants had to get rid of plaintiff's case. Cunningham insists that he said to Stephens that Marathon's crossclaim was not going to go away.

14. Cunningham then got approval from the carrier for his client for the $150,000, and Cunningham told Stephens of that.

15. On September 15, 2009, Cunningham sent a letter to Stephens. Mot. at Exhibit 2. In the letter, Cunningham indicated that Marathon's carrier had approved the acceptance of Stephens' offer to jointly settle the case with Casanova for a contribution of $150,000 by Marathon if Chesapeake made up the difference "to fully settle the case," and if Stephens provided confirmation that Chesapeake's carrier was in receivership in Texas but was still able to pay the balance of the agreed upon settlement amount. Id.

16. Within a day or two, on either September 15, or September 16, 2009, Stephens

called Krikawa and said that he had combined authority to settle the entire case for $440,000, with the understanding that Krikawa had to satisfy the workers' compensation lien that was being asserted by the insurance carrier that had paid Casanova workmen's compensation.

17. Krikawa then spoke to his client and his client's wife, in order to get a sense of how they wanted him to negotiate with counsel for the insurance carrier.

18. Krikawa called the attorney for the insurance carrier, and they negotiated over the next two weeks, culminating in an offer being made by the insurance carrier to Casanova.

19. Krikawa then spoke to Casanova and Casanova's wife and they gave him authority to accept the $440,000 that Stephens had previously offered, subject to the carrier's lien. Krikawa then called Stephens at about 4 p.m. on September 29, 2009 and left a message on Stephens' voice mail accepting the offer of $440,000.

20. During the period from September 15 to September 29, 2009, Krikawa did not speak or otherwise communicate with Cunningham.

21. Krikawa always understood that the offer being made to him by Stephens was a joint offer on behalf of both remaining defendants.

22. During these discussions, no one spoke to Krikawa of any claims remaining outstanding.

23. Meanwhile, on September 17, 2009, Stephens sent Cunningham a letter in

response to his September 15, 2009[4] letter. Mot. at Exhibit 3. In the letter, Stephens indicated that settlement could not be guaranteed, but that Marathon would not be required to pay more than $150,000.00. Id. Stephens also stated that Highland, Chesapeake's carrier, was in receivership but had sufficient funds to settle the case. Id. Finally, Stephens wrote "that a settlement of the case extinguishes all claims by all parties, specifically including any claims Marathon may have against Chesapeake." Id.

24.    On September 23, 2009, Cunningham and Stephens again spoke by telephone. Mot. at Exhibit 4.

25.    On September 24, 2009, Cunningham sent Stephens a letter in response to his September 17, 2009 letter. Mot. at Exhibit 4. In the letter, Cunningham indicated that he did not agree with Stephens' statement in his letter that settlement of the case with Casanova would extinguish all other claims, including, of course, the claim that Marathon had against Chesapeake based on this Court's order of August 7, 2007. That order precluded Chesapeake from defending itself against Marathon's crossclaim that would have led to an eventual judgment on that crossclaim against Chesapeake, awarding Marathon its costs for defending itself against Casanova's claim. Cunningham also stated that if Chesapeake refused to pay Marathon's defense costs, the offer to contribute $150,000.00 towards settlement with Casanova would be rescinded. Id.

---

[4] In the letter, Stephens references a letter from Cunningham dated September 17 but as there is no such letter, the court presumes this was a typographical error and that Stephens intended to reference Cunningham's September 15 letter.

26.     On September 30, 2009, Stephens sent a letter to Cunningham in response to his September 24, 2009 letter. Mot. at Exhibit 5. In the letter, Stephens indicated that in the conversation that took place on September 14, 2009 immediately following the status hearing in court, "it was made very clear and was fully understood" that the $150,000.00 amount contributed by Marathon would resolve all outstanding issues, including any claim Marathon had against Chesapeake. Id. Stephens also told Cunningham that Casanova had already accepted their offer. Id. Finally, Stephens indicated that Cunningham knew that these were the terms of the offer as evidenced by the fact that Cunningham had previously indicated that Marathon's management wasn't happy that the defense costs had been waived. Id.

27.     On September 30, 2009, Cunningham sent Stephens a letter in response to his earlier letter on the same day. Mot. at Exhibit 6. In the letter, Cunningham denied the accuracy of Stephens' interpretation of their previous conversation. Id. Cunningham also denied that he had waived Marathon's defense costs. Id. According to Cunningham, no offer had been made and no acceptance had been given. Instead, Cunningham indicated that the parties were still negotiating. Id. Finally, Cunningham stated that Marathon would still contribute $150,000.00 towards settlement with Casanova but that Marathon retained the right to seek attorneys fees and costs against Chesapeake. Id.

28.     On October 1, 2009, Stephens sent Cunningham a letter in response to his September 30, 2009 letter. Mot. at Exhibit 7. In the letter, Stephens indicated that Cunningham had told him that Marathon's adjuster had been fired for agreeing to

settle the case with Casanova for $150,000.00. Id.

29.      Stephens had authority to negotiate a settlement with Casanova on behalf of both Chesapeake and Marathon.  Proof of that authority appears first in Cunningham's September 15, 2009 letter, in which he referenced "the balance of the settlement figure [Stephens] finally negotiate[d] with plaintiff's attorney" and second in Stephens' October 1, 2009 letter to Cunningham, in which he stated that "[b]ased upon Marathon's contribution, [he] was authorized to negotiate a settlement with the plaintiff." Mot. at Exhibits 2, 7.

## RULINGS ON LEGAL ISSUES

I.    Questions Presented

Casanova, through his communications with Stephens, negotiated a settlement with Chesapeake and Marathon, in exchange for a certain amount of money.  Based on that agreement, Casanova then negotiated a lien with his workmen's compensation carrier, assuming a new obligation as a result of the settlement that he thought he had achieved with the defendants.  Stephens, acting on behalf of Chesapeake, negotiated a deal with Casanova whereby Casanova would accept $440,000.00[5] in satisfaction of all his claims.  Stephens believed, however, that Chesapeake's contribution of $290,000.00 to the settlement with Casanova absolved any obligation Chesapeake had to satisfy any outstanding judgment the court would ultimately enter against Chesapeake as a result of its failure to timely file an answer to

---

[5] Although this figure is not referenced in the documents submitted by the parties in relation to Chesapeake's pending motion to enforce settlement, both parties concede that Krikawa was offered this amount by Stephens, on behalf of Chesapeake and Marathon.  See Mot. at 4; Defendant Marathon's Opposition to Co-Defendant Chesapeake's Motion to Enforce Settlement at 6.  Furthermore, Krikawa also testified to that effect.

Marathon's cross claim. Finally, Cunningham, acting on behalf of Marathon, agreed to contribute $150,000.00 to the settlement of Casanova's claims. Cunningham believed, however, that settling Casanova's claims would have no effect on any outstanding judgment that Marathon would ultimately secure against Chesapeake.

The questions presented, therefore, are as follows: 1) Did Stephens, acting on behalf of Chesapeake have actual authority to negotiate a settlement with Casanova on behalf of both Chesapeake and Marathon? 2) Was there a valid and enforceable agreement between (a) Casanova and Chesapeake and Marathon and (b) Chesapeake and Marathon? 3) If there was no valid agreement between Marathon and Chesapeake, is Casanova still entitled to enforcement of his contract with them? 4) Does Marathon still have the right to enforce the judgement it received against Chesapeake?

II.  Stephens Had Actual Authority To Negotiate a Settlement With Casanova On Behalf Of Both Chesapeake and Marathon

Casanova dealt with Stephens, who acted with actual authority on behalf of his own client, Chesapeake, and who acted with actual authority on behalf of Cunningham's client, Marathon. Cunningham gave him that authority, the authority to bind Marathon upon the terms and conditions proposed by Stephens, i.e., the payment of $440,000.00, with the understanding that Casanova would then negotiate a settlement between himself and his workmen's compensation carrier. As to Casanova, there was, therefore, an offer by a lawyer who had actual authority to represent both his client, Chesapeake, and its co-defendant, Marathon. The agreement reached, therefore, was made by counsel for a party, who unquestionably had actual authority to bind both his client and Marathon. This agreement contained certain and definite

terms that admitted of no ambiguity: in exchange for $440,000.00, Casanova would settle his claims against Marathon and Chesapeake but would take full responsibility for paying the workmen's compensation carrier lien.  It would be hard to imagine a better text book example illustrating the principles of offer and acceptance and showing how an agent binds his principal by negotiating with a third party within the limits of the actual authority the agent has.

Even where the agent's authority is only apparent, "a court may consider whether a third party 'reasonably relied upon conduct of the principal (including acquiescence) or conduct of the agent for which the principal is responsible,'" although the burden rests at all times with the third party to "show that the reliance was to his or her detriment." Gonzalez v. Internacional De Elevadores, S.A., 901 A.2d 227, 238 (D.C. 2006) (internal quotations and citations omitted).  See also Wagshal v. Selig, 403 A.2d 338, 344-45 (D.C. 1979) ("'[a] third party seeking to hold a principal on the apparent authority of the agent must show acts or statements of the principal known to the third party and on which the third party reasonably relied to his detriment.'") (internal quotation omitted).  Here, from the beginning of their negotiations after the September 14, 2009 status conference, Cunningham and Stephens never did anything to dissuade Krikawa from reasonably believing that either one of them could bind the other by making a joint offer on both their behalfs to settle the case.  Krikawa relied upon their conduct in presenting to his client and then accepting on his client's behalf an offer that he most reasonably believed came jointly from Marathon and Chesapeake.

III.    Although There Was No Meeting Of the Minds Between Chesapeake and Marathon and Therefore No Contract Between Them, They Are Nevertheless Estopped From Denying the Existence Of a Contract As To Casanova

The conclusion that there never was a contract between Chesapeake and Marathon is

compelling.  As Stephens understood it, by negotiating a settlement with Casanova on behalf of both defendants, Chesapeake simultaneously escaped payment of the judgment previously awarded Marathon.  Cunningham, on the other hand, believed that Marathon was only obliged to contribute to the settlement with Casanova but retained its right to enforce the judgment against Chesapeake for attorneys fees.  Because there was such a fundamental misunderstanding, there was therefore no mutual assent to the terms of the agreement–the *sine qua non* of a contract under District of Columbia law.  See Malone v. Saxony Coop. Apartments, 763 A.2d 725, 729 D.C. 2000) ("For there to be an enforceable contract, there must be mutual assent of the parties to all the essential terms of the contract.").  Hence, at first glance, the parties do not appear to be bound.  Such a conclusion, however, does a glorious injustice to Casanova.

Casanova negotiated an agreement in perfect good faith with a lawyer who had actual authority to act for both defendants.  Furthermore, Casanova changed his position, abandoning his right to go to trial and settling the lien.  Letting both defendants escape from that agreement punishes Casanova and robs him of the deal he made because of confusion that the defendants created, confusion that could have been avoided had they only made their intentions clear.  To visit upon Casanova the consequences of Stephens' and Cunningham's misunderstanding punishes the one person who is absolutely blameless.  Such an unconscionable result truly insults the most fundamental concepts of fairness.

Moreover, if there was any doubt as to that conclusion– and there isn't– Casanova has a textbook case for promissory estoppel, a doctrine clearly recognized in the District of Columbia.  See Bender v. The Design Store Corp., 404 A.2d 194, 195-96 (D.C. 1979) ("First, was there a promise?  Second, should the promisor have expected the promisee to rely on the promise: And

11

did the promisee so rely to his detriment?  Finally, would injustice result from a failure to enforce the promise?").  There was an offer made by a person who had authority to make it, and in reliance upon it, Casanova changed his position by (a) surrendering his right to pursue his claim against the defendants and (b) undertaking to negotiate the lien and pay all of it out of his share. Undoing that when Casanova acted in the utmost good faith upon reliance on those who unquestionably had the power and authority to make the deal they did would be inequitable to the point of being unconscionable.  How could one possibly justify negating a contract that unquestionably came into existence between Casanova and Chesapeake and Marathon because, unbeknownst to Casanova, Chesapeake and Marathon had failed to express their intent to each other?  Chesapeake and Marathon should not escape the liability they undertook to accept because their minds never met as to their agreement *inter se*.  It is impossible to justify negating the clear terms of a contract freely entered into that is unquestionably enforceable because the parties on one side of that contract failed to express the terms of their agreement clearly to each other.  The Court must therefore conclude that there was a valid contract between Casanova and Chesapeake and Marathon and that judgment must be entered in Casanova's favor pursuant to its terms.[6]

---

[6] An inaccurate written contract may be reformed where there has been *no detrimental reliance by a third party*, as long as the parties' intent was identical:

> Where both parties have an identical intention as to the terms to be embodied in a proposed written . . . contract . . . and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, *if innocent third persons will not be unfairly affected thereby.*

Restatement (First) of Contracts § 504 (1932) (emphasis added).  Analogously, this means that

IV.     Marathon No Longer Has the Right To Enforce the Judgment Against Chesapeake

Since the deal made between the defendants and Casanova cries out for enforcement, the question becomes who should bear the burden of paying Casanova.  If the deal is enforced as Chesapeake understood it, then, as explained above, Chesapeake would escape the order that, in effect, would require it to pay Marathon's defense costs or at least escape the necessity of appealing from that order and trying to get it reversed.  If, on the other hand, the deal is enforced as Marathon understood it, then Chesapeake would be compelled to pay defense costs that it claimed it believed it would not have had to pay if it paid Casanova its share of what Casanova wanted and ultimately agreed to accept.

Having heard the testimony, I cannot say that I find unreasonable or unfair the supposition by Stephens that he believed that his client was escaping all liability if it paid its share of what was owed to Casanova.  While I appreciate that Cunningham believed in equal good faith that the deal he made with Chesapeake was independent of the liability that Chesapeake had under the order, as between the two, acceptance of Stephens' understanding reaches a fairer result than acceptance of Cunningham's.  Lawyers get paid to be careful and to take what may appear to be extraordinary pains to protect their clients from contingencies that may appear to be far-fetched and unlikely.  In this case, it appears to me that when two lawyers are discussing a settlement that will relieve their clients of a shared obligation to a third party and one of those lawyers fails to mention whether an outstanding and potential judgment between

Casanova's rights cannot be surrendered to the confusion that was created by Stephens' and Cunningham's failure to clearly articulate what they intended when they communicated the offer to Krikawa.  Cf. Aetna Casualty & Surety Co. v. Kemp Smith Co., 208 A.2d 737, 740 (D.C. 1965) (reliance in District of Columbia on Restatements).

them will or will not be affected by the payment of monies to the third party, the risk of subsequent confusion should fall on the beneficiary of that potential judgment, rather than the opposing party. Lawyers, particularly the experienced ones involved in this case, seek to absolve their clients from all potential liability when they settle; very few lawyers leave their clients open to additional liability when they ask their clients for money. This notion is captured by the words "final settlement." It would appear to me therefore that counsel for Marathon should have made it clear that Chesapeake's liability to Marathon survived the payment to Casanova before he committed himself and his client (Marathon) to making the offer to Casanova that Casanova ultimately accepted. Had he only done so we would not be where we now are.

Moreover, while that result seems harsh, the alternative–denying Casanova the settlement to which he is unquestionably entitled– is unconscionable. Between Casanova and Marathon, the equities all favor the former. If burden has to fall anywhere, it has to fall on Cunningham, because he could have prevented the misunderstanding with Stephens by specifying the precise deal that Marathon was accepting from Chesapeake.

I will therefore order that judgment be entered in accordance with this Opinion as follows:

1.      Judgment will be entered in favor of plaintiff in the amount of $440,000 with the understandings that (1) plaintiff shall be solely responsible for satisfying any workmen's compensation claim that is or will be asserted as a lien on any such judgment and (2) that Chesapeake shall pay $290,000 of that judgment and Marathon the remaining $150,000.

2.      Each party shall pay its own fees and costs, meaning that Chesapeake is relieved

of any obligation to pay Marathon's defense costs as required by this court's order

of August 7, 2007.

**SO ORDERED.**


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE